FIFTH DIVISION
September 7, 2007

No. 1-06-1373

| | | |
|---|---|---|
| KOPLEY GROUP V., L.P., an Illinois Limited Partnership, | ) | Appeal from the |
| as Beneficiary Under Chicago Title and Trust Company | ) | Circuit Court of |
| Trust No. 1106522, dated November 4, 1998, and THE | ) | Cook County |
| KOPLEY GROUP, INC., an Illinois Corporation, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SHERIDAN EDGEWATER PROPERTIES, LTD., | ) | Honorable |
| VRANAS AND ASSOCIATES, LTD., an Illinois | ) | Paddy H. McNamara, |
| Corporation, a/k/a Vranas and Chioros Realty Group, Inc., | ) | Judge Presiding. |
| WILLIAM P. VRANAS, Individually, MICHAEL M. | ) | |
| CHIOROS, Individually, and JOHN P. VRANAS, | ) | |
| Individually, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

JUSTICE GALLAGHER delivered the opinion of the court:

Plaintiffs, Kopley Group V., L.P., an Illinois limited partnership, as beneficiary under

Chicago Title and Trust Company Trust No. 1106522, dated November 4, 1998, and The Kopley

Group, Inc., an Illinois corporation, appeal from an order of the circuit court of Cook County

granting summary judgment in favor of defendants, Sheridan Edgewater Properties, Ltd., Vranas

& Associates, Ltd., an Illinois corporation, a/k/a Vranas & Chioros Realty Group, Inc., William P. Vranas, individually, Michael M. Chioros, individually, and John P. Vranas, individually. We affirm in part, reverse in part, and remand.

BACKGROUND

This case involves the sale and purchase of real property commonly known as 5200 North Sheridan Road in Chicago (the property) and allegations of misrepresentation, fraud and breach of contract. The property consists of an eight-story apartment building with 223 dwelling units and first-floor commercial space. The seller of the property is defendant Sheridan Edgewater Properties, Ltd. (the Seller).

In 1996, the City of Chicago (the city) had an ordinance requiring routine inspections of the exterior facade on high-rise buildings (the Chicago facade ordinance). Chicago Municipal Code §13– 196–35. (eff. January 10, 1996). Reports of such inspections were to be filed with the city, describing any repair work that was necessary. The Seller had followed that program and had retained Crest Consulting Engineers, P.C. (Crest), to conduct inspections of the property in 1996 and 1997. Both times, Crest generated an exterior facade report and a descriptive letter to be attached to the standard city form, the latter of which was entitled "Report on Ongoing Inspection and Repair Program of Exterior Walls and Enclosures." Both were stamped "accepted" and signed by the city.

The report prepared in 1997 (for the 1996 inspection) by Crest was dated May 28, 1997 (the 1997 Crest report). The Seller filed the 1997 Crest report with the city approximately one month later, on June 25, 1997.

The report prepared in 1998 (for the 1997 inspection) by Crest was dated March 25, 1998 (the 1998 Crest report). The 1998 Crest report noted, among other things, that shifting brick lintels were "imminently hazardous." The Seller undertook these repairs of the "imminently hazardous" conditions in March 1998. The repairs were performed by Gulf Construction for substantial sums of money. The Seller filed the 1998 Crest report with the city on November 13, 1998, approximately eight months after the report was originally prepared and after all of the issues had been addressed. Ten days later, on November 23, 1998, the Seller sent the city a letter informing it that all conditions noted in the 1998 Crest report had been corrected.

In the spring or early summer of 1998, K. Nicholas Kopley (Mr. Kopley) saw an advertisement in the Chicago Tribune newspaper for the sale of the property. Mr. Kopley is a sophisticated owner and purchaser of rental real estate. He first started acquiring residential real estate in 1992. In 1995, Mr. Kopley formed Kopley Group, Inc., which would serve as general partner in limited partnerships that owned rental properties. Mr. Kopley serves as president and principal shareholder of The Kopley Group, Inc.

By 1998, Kopley Group, Inc., was the general partner in four limited partnerships that owned and managed six separate rental properties. One of the buildings was in excess of four stories.

After Mr. Kopley saw the advertisement for the property, he contacted a broker who requested information on the property on Mr. Kopley's behalf. Subsequently, defendant Vranas & Associates, Ltd. (Vranas & Associates), in its capacity as a real estate broker for Sheridan Edgewater Properties, Ltd., sent a letter to Mr. Kopley stating that informational materials

relating to building and financial information regarding the property were available and would be furnished subject to Mr. Kopley executing a confidentiality agreement. At the time, the other three defendants, William P. Vranas, Michael M. Chioros, and John P. Vranas, were individual brokers who also had an ownership interest in the property. Defendant William P. Vranas was president of the Seller and executed the contract on the Seller's behalf. Defendant John P. Vranas also acted as a property manager of the property. The real estate brokers shall be referred to collectively as "the Brokers" or individually by name, where applicable.

On August 12, 1998, Mr. Kopley executed the confidentiality agreement. At some point, Mr. Kopley toured the property and wanted to buy it. Mr. Kopley made some preliminary calls to see if there were investors interested in the property.

On or about September 3, 1998, Mr. Kopley made an offer that was not accepted. In late September 1998, Mr. Kopley learned from his broker that a previously accepted offer might not be going through. Mr. Kopley resubmitted an offer.

On September 24, 1998, the previous purchaser(s) cancelled their September 14, 1998, contract because the condition of the premises was not acceptable to them, based upon "their inspection of the Premises, and their review of the documents and other materials disclosed to them."

On October 15, 1998, the parties in the instant case entered into a written real estate sales contract for the property for a sales price of $7,525,000. Mr. Kopley signed the contract.

Mr. Kopley prepared a confidential private offering memorandum, dated October 20, 1998, to solicit investors in the limited partnership that would be the beneficial owner of the

property, Kopley Group V., L.P, a plaintiff in this case. The other plaintiff, The Kopley Group, Inc., is the general partner of Kopley Group V., L.P. We shall refer to both plaintiffs collectively as "the Buyer," where applicable. Mr. Kopley, at all times, acted on behalf of the Buyer in the purchase of the property. The Buyer's initial cash investment in the property was $1,500,000. Mr. Kopley personally contributed $300,000 of the initial capital.

In the confidential private offering memorandum, the Buyer states as follows: "An examination of the files and permit files of the Building Department of the City Of Chicago does not reflect any building code violations other than those cited in Exhibit 'A' of this Memorandum."[1]

At some point prior to closing, in order to obtain financing, The Kopley Group, Inc., prepared a "General Property Inspection" report that noted that the "the building was constructed in 1926" and stated that "the structure is in good condition with no sign of major structural flaws."[2] The Buyer further represented that there were no outstanding building code violations on record.

The real estate contract (the contract) contained a rider that was attached and made a part of the contract. The rider provided, in pertinent part, as follows:

---

[1] None of the parties have discussed the contents of "Exhibit A."

[2] The Buyer's brief does not refer to this report. The report is contained in the record as an attachment to the Brokers' motion for summary judgment and is referred to by the Sellers here. The actual date of the inspection, however, is not provided in the Seller's brief or in the document contained in the record.

"R-1 SELLER'S REPRESENTATIONS AND WARRANTIES: Seller represents and warrants:

* * *

6. To the knowledge of Seller there are no:

* * *

B. Outstanding unfulfilled requirements or recommendations of any insurance company or inspection or rating bureau concerning the Premises for any repair or alteration therefor.

* * *

R-2 INSPECTION: Purchaser shall have the right to inspect and approve the Real Estate for the period of fifteen (15) business *** days from and after the date of execution hereof ('Due Diligence Period'). In the event Purchaser determines in its sole discretion, the Real Estate and improvements are not satisfactory, Purchaser shall have the right to terminate this Agreement by serving written notice of termination on Seller on or before the expiration of the Due Diligence Period. If Purchaser does not terminate this Agreement pursuant to this paragraph, Purchaser will be deemed to have waived any objections to the Real Estate and improvements and this Agreement shall continue in full force and effect. If Purchaser terminates this Agreement pursuant to this paragraph, the earnest money shall be returned to Purchaser.

Purchaser agrees that it will be acquiring the property and improvements

AS IS and that the Purchaser's sole remedy relative to the condition of the premises, environmental matters and structural matters are [*sic*] set forth in Rider R-2 and R-3 herein.  All other warranties, expressed and implied are disclaimed.

R-3 ENVIRONMENTAL and STRUCTURAL: Purchaser shall within twenty (20) business days of this Agreement complete and approve all environmental and structural reports at Purchaser's sole cost and expense.  In the event Purchaser determines that the structural or environmental report is not acceptable then this Agreement shall be null and void and all earnest monies shall be returned to Purchaser.

\* \* \*

R-6 FINANCIAL INFORMATION: Seller agrees to furnish financial information on the property for the last three years and current year, current leases and any other documents Purchaser may reasonably require to perform its Due Diligence."

The contract and the rider were both drafted by the Buyer's attorney.

The Buyer, whose first bid had been rejected, was aware that the Sellers had entered into an earlier sales contract with another entity and that it did not close.  The Buyer asked why the prior deal had fallen through.  Defendant-broker Michael M. Chioros (Chioros), who was senior vice president of Vranas & Associates, answered that the previous buyer had attempted to renegotiate the entire contract.  In his affidavit dated September 20, 2005, Mr. Kopley stated that Chioros "never mentioned that the deal was terminated by the buyer because the conditions at the

7

building were unacceptable to the buyer." Earlier, however, at his deposition on May 20, 2004, Mr. Kopley had testified that Chioros *had* told him that the sewer work and tuckpointing were items that he recalled were an issue with the previous buyer. Moreover, on October 23, 1998, pursuant to its due diligence review, the Buyer sent a letter to Chioros. In the letter, the Buyers requested, among other things, "existing building code violation[s]," "any available engineering reports/studies," and "Bid/Estimates for work scheduled or performed regarding a)sewer repairs [and] b) facade/tuckpointing." Thus, it appears that the Buyers made some of these requests in response to Chioros' representations that facade problems existed at the Property that were being corrected. The Buyer's attorney, however, later testified that he was told by Chioros that the exterior problems were minor.

The Buyer obtained extensions of time to complete its due diligence. The Buyer sent letters requesting extensions on November 3 and November 6, 1998. The November 3 request was made to allow the Buyer to, among other things, review the engineering report regarding tuckpointing and the facade and to confirm completion of all exterior work. The November 6 letter requested an additional 14 days, up to and including November 17, 1998, for the environmental contingency, as well as "confirmation of completion of the sewer work and the scheduled tuckpointing/facade work." Mr. Kopley, however, later admitted that he requested the extension for the actual purpose of obtaining additional time to acquire financing. The Buyer apparently did not have the building inspected by an architect or engineer at that time. As noted earlier: (1) during this period, the Seller filed the 1998 Crest report with the city on November 13, 1998, and (2) 10 days later, on November 23, 1998, the Seller sent the city a letter informing it

that all conditions noted in the 1998 Crest report had been corrected.

Although it is undisputed that the 1998 Crest report was referred to in the November 23, 1998, letter that the Seller sent to the city, the Buyer has asserted that this date was after the Buyer's due diligence period had expired. In any event, in its letter to the city, the Sellers stated that all conditions noted in the 1998 Crest report had been corrected.

Apparently, the Seller referred to the engineering report in materials sent to the Buyer, but the Buyer contends that it thought the reference was to a different document, namely, a quote of $4,300 for labor and materials from Stamatiou Construction Company, dated October 6, 1998 (Stamatiou quote). The Stamatiou quote calls for the repair of eight items, including:

"East elevation cracked vertical patch masonry

Vertical crack in masonry east elevation

Spiral in limestone accent band

Crack in limestone ledge in northwest corner

Vertical crack in limestone accent band

Cracked limestone and cracked patches

Shifted brick lintel

Loose duct work on north elevation."

It is undisputed that the Buyer received a copy of the Stamatiou quote.

Significantly, the items that needed work according to the 1998 Crest report were the same items listed in the Stamatiou quote. Moreover, the defects for which the Buyer was cited by the city involved the walls of the property bowing away from the frame of the building; defects

1-06-1373

that were not present in either the 1997 or 1998 Crest report.

The parties agree, however, that it is disputed whether the 1998 Crest report was sent. It is undisputed that the Seller had included a Crest report as an attachment in the real estate contract involving the earlier deal that had fallen through, although it is unclear whether the 1997 Crest report or the 1998 Crest report or both were attached. The transaction between the parties closed on February 12, 1999.

The Buyer, which alleges that it was unaware of the Chicago facade ordinance, did not have the building inspected in 1999, nor in 2000, and did not provide the city with the required reports. In 2001, the Buyer was informed by the city that it had not submitted an inspection report for 1999 and was cited by the city with building violations relating to structural defects at the property. The defects involved the walls of the property bowing away from the frame of the building; defects that were not present in either the 1997 or 1998 Crest report. The Buyer subsequently hired an architect, Klaus Koch, of Scheckerman Koch, in 2001 to carry out a city inspection. Koch performed an inspection "from afar," which means he used binoculars or visually inspected the property from street level. Koch issued a report saying the "building was safe with a repair and maintenance program." The report included facade sketches indicating areas that needed to be repaired. Mr. Kopley testified that the Buyer did not do the repairs at the time and chose to wait until a critical examination was due in 2002.[3]

_____

[3]As defendants note, the failure to submit the annual report when due triggers the requirement that a critical examination report be filed within six months of the due date of the missing report. Chicago Municipal Code §13–196–035 (eff. January 10, 1996).

In the spring of 2002, the Buyer hired a contractor to begin to do some of the work identified by Koch in his report and to begin the critical examination. In July 2002, the Buyer received a "stop work" order from the city because it was doing the work without a permit.

The Buyer, in December 2002 or January 2003, hired a licensed architect and engineer, Tim Thompson of Construction Resource, Inc., to perform inspections. Thompson prepared a portion of the 2003 critical report. Thompson later testified that, although he noticed some similar types of problems in 2003, he could not say if they were the same areas that were repaired in 1998. He did not know when the conditions he reported in his 2003 critical report first became visibly obvious and was not sure if they would have been visible in 1998. The alleged problem with the inner wall was not detectable in 2003 until a portion of the brick was removed and the wall was opened. Thompson testified that it was the type of problem that happens over time, as the result of metal corroding. Thompson also testified that he found evidence that the facade had been repaired in various places over the past 10 years.

In 2003, the Buyer retained Wiss Janney to complete the critical examination. Wiss Janney found no imminently hazardous conditions. The Buyer ultimately repaired the building in 2003.

On May 27, 2003, the Buyers filed a five-count complaint. Count I alleged breach of contract against the Seller. Count II alleged fraudulent misrepresentation against the Seller and the Brokers. Count III alleged negligent misrepresentation against the Seller and the Brokers. Count IV alleged violations of the Real Estate License Act of 1983 (225 ILCS 454/1 *et seq.* (West 1996)) against the Brokers. Count V alleged violations of the Consumer Fraud and

1-06-1373

Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2002)) against the Seller and the

Brokers. On December 1, 2005, the trial court granted summary judgment in favor of defendants

on all counts. The trial court subsequently denied the Buyer's motion for reconsideration. This

appeal followed.

ANALYSIS

Our standard of review of an order granting summary judgment is *de novo*. *Horwitz v.*

*Holabird & Root*, 212 Ill. 2d 1, 8, 816 N.E.2d 272, 276 (2004). Although a plaintiff is not

required to prove its case at summary judgment stage, it nonetheless must present a factual basis

that would arguably entitle it to judgment in its favor. *Connor v. Merrill Lynch Realty, Inc.*, 220

Ill. App.3d 522, 528, 581 N.E.2d 196, 200 (1991). Summary judgment is properly granted where

the pleadings, depositions, admissions, affidavits and exhibits on file, when viewed in the light

most favorable to the nonmoving party, show that there is no genuine issue of material fact and

that the movant is entitled to judgment as a matter of law. *Petrovich v. Share Health Plan of*

*Illinois, Inc.*, 188 Ill. 2d 17, 30-31, 719 N.E.2d 756, 764 (1999). Although summary judgment

can aid in the expeditious disposition of a lawsuit, it is a drastic measure and should be allowed

only " 'when the right of the moving party is clear and free from doubt.' " *Morris v. Margulis*, 197

Ill. 2d 28, 35, 754 N.E.2d 314, 318 (2001), quoting *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489

N.E.2d 867, 871 (1986). Applying this standard of review, we shall address each count of the

Buyer's complaint.

Count I. Breach of Contract

The construction, interpretation, or legal effect of a contract presents a question of law

that we review *de novo*. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129, 835 N.E.2d 801, 821 (2005). To succeed on a claim for breach of contract, a plaintiff must plead and prove the existence of a contract, the performance of its conditions by the plaintiff, a breach by the defendant, and damages as a result of the breach. *Associated Underwriters of America Agency, Inc. v. McCarthy*, 356 Ill. App. 3d 1010, 1019, 826 N.E.2d 1160, 1168 (2005). While this court need not defer to the trial court's decision, we agree with the trial court's analysis here. The trial court correctly concluded that any damages sustained by the Buyers were not caused by any alleged breach of the Seller.

The Buyer first contended that the Seller breached the contract by failing to provide a copy of the 1998 Crest report. As the trial court correctly noted, nowhere within the agreement did the Seller agree to provide that report. The contract is silent as to the Seller's production of engineering reports. The only provision in the contract that deals with the Seller's production of documents is R-6 and concerns "Financial Information," not engineering reports.

Assuming *arguendo* that the failure to provide the 1998 Crest report constituted a breach, any damages sustained by the Buyer were not the result of its not receiving that report. Although the 1998 Crest report noted that shifted brick lintels could be considered imminently hazardous, the report further noted that Crest "found the exterior masonry to be in good condition." There is nothing in the 1998 Crest report that would inform either the Buyer or the Seller of the repairs for which the Buyer now seeks damages.

As the trial court correctly noted, nothing in the 1998 Crest report "informed [the Seller] of the major structural issue." The Buyer claims, however, that the real problem was underneath

the facade and the connection between the facade and the building's main structure was bad. The Buyer asserts that the Seller was aware of that problem because the Crest report told of shifted lintels. But the Buyer was also aware of the shifted brick lintel because the need for the repair of that condition was one of the eight contained in the Stamatiou quote, a copy of which the Buyer undisputedly did receive.

Moreover, as the Seller points out, Crest merely "conducted a visual examination of the exterior facade." Crest "reviewed the building from the roof, the court yards and the surrounding grounds." Therefore, the Buyer could have learned every fact contained in the 1998 Crest report by simply looking at the building.

Indeed, Mr. Kopley looked at the building several times. If the building had shifted lintels, they were open and obvious for any architect or engineer to observe. Nonetheless, the Buyer admits it "did not have the building inspected by an architect or engineer at the time."

The Buyer has also alleged that the Seller breached the contract by "transferring the property to the buyer with known structural defects and imminently hazardous conditions." Again, as the trial court correctly noted, "nowhere within the agreement does the Seller warrant that there are no known structural defects and/or imminently hazardous conditions." To the contrary,

Provision R-2 provides, in relevant part:

"Purchaser agrees that it will be acquiring the property and improvements AS IS and that the Purchaser's sole remedy relative to the condition of the premises, environmental matters and structural matters are [*sic*] set forth in Rider

14

R-2 and R-3 herein. All other warranties, expressed and implied are disclaimed." This provision reveals that the Seller explicitly disclaimed any warranties with respect to the structural condition of the property.

The Buyer also attempts to rely on another section of the agreement to support its breach of contract claim. Provision R-1 (6)(B) of the contract provides that: "To the knowledge of Seller there are no * * * [o]utstanding unfulfilled requirements or recommendations of any * * * inspection or rating bureau concerning the Premises for any repair[.]" Again, as the trial court correctly noted, the only evidence provided by the Buyer regarding any outstanding recommendations concerning the property that were not completed is the 1998 Crest report, which found "a few areas of wall distress in need of repair." The Buyer has not alleged that the failure to repair "a few areas of wall distress" caused the damages of which it complains. The Buyer's attorney stated that it is his belief that these specific items were indeed repaired by Stamatiou.

Notably, the contract provides that the Seller "agrees that it will be acquiring the property and improvement AS IS." This court has explained that "[t]he term 'as is' is generally understood to mean that the buyer is purchasing goods in their present condition with whatever faults they may possess." *Pelc v. Simmons*, 249 Ill. App. 3d 852, 856, 620 N.E.2d 12, 14 (1993); *Lake Bluff Heating & Air Conditioning Supply, Inc. v. Harris Trust & Savings Bank*, 117 Ill. App. 3d 284, 292, 452 N.E.2d 1361, 1367 (1983). The term "as is" is similar to terms such as "with all faults" or "in its present condition" and implies that the seller is relieved of any further obligation to reimburse for loss or damage because of the condition of the goods. *Pelc v. Simmons*, 249 Ill.

App. 3d at 856, 620 N.E.2d at 14; *Lake Bluff Heating & Air Conditioning Supply, Inc. v. Harris Trust & Savings Bank*, 117 Ill. App. 3d at 292, 452 N.E.2d at 1367. Contracts for the sale of real property often contain an "as is" provision. See, *e.g.*, *Van Gessel v. Folds*, 210 Ill. App. 3d 403, 569 N.E.2d 141 (1991); *Lake Bluff Heating & Air Conditioning Supply, Inc. v. Harris Trust & Savings Bank*, 117 Ill. App. 3d 284, 452 N.E.2d 1361 (1983); *Schoeneweis v. Herrin*, 110 Ill. App. 3d 800, 443 N.E.2d 36 (1982); *Century Display Manufacturing Corp. v. D. R. Wager Construction Co.*, 71 Ill. 2d 428, 376 N.E.2d 993 (1978). As with the sale of other goods, when a real estate contract contains an "as is" provision, it means that the purchaser agrees to take the property in its existing condition with whatever faults it may possess and implies that the seller is relieved of any further obligation to reimburse for loss or damage because of the property's condition.

The Buyer knew it was purchasing an older building to which facade work had been done in the past. The Buyer was given unfettered freedom to inspect any portion of the building. The Buyer was even given additional time to do so on the stated grounds that more time was needed for inspection, *i.e.*, to " review the engineering report regarding tuckpointing and the facade and to confirm completion of all exterior work" and again for "confirmation of completion of the sewer work and the scheduled tuckpointing/facade work."

An "as is" provision in a real estate contract is controlling so long as it was both expected and bargained for. *Van Gessel v. Folds*, 210 Ill. App. 3d 403, 569 N.E.2d 141 (1991). That was the case here. Thus, we agree with the Seller that the Buyer's breach of contract claim fails as a matter of law because of the presence of the "AS IS" provision in the contract. The trial court

16

correctly granted summary judgment in favor of defendants on count I.

Counts II and III: Fraudulent and Negligent Misrepresentation

The Buyer also alleged that all defendants either negligently or fraudulently misrepresented the structural condition of the building. The Buyer alleged both commission and omission, *i.e.*, affirmative misrepresentation and misrepresentation by concealment.

The elements for negligent misrepresentation and fraudulent misrepresentation that a plaintiff must plead and prove are quite similar. *Board of Education of the City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 452, 546 N.E.2d 580, 591 (1989). The Illinois Supreme Court has "formulated the elements in a fraudulent misrepresentation as: (1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance." *A, C & S, Inc.*, 131 Ill. 2d at 452, 546 N.E.2d at 591; see also *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286, 402 N.E.2d 599, 601 (1980).

Negligent misrepresentation has essentially the same elements as fraudulent misrepresentation, with the exception of the defendant's mental state. *A, C & S, Inc.*, 131 Ill. 2d at 452, 546 N.E.2d at 591. The difference is that, in the case of negligent misrepresentation, the defendant need not know that the statement is false. *A, C & S, Inc.*, 131 Ill. 2d at 452, 546 N.E.2d at 591. That is, the defendant's own carelessness or negligence in ascertaining the truth of the statement will suffice for a cause of action. *A, C & S, Inc.*, 131 Ill. 2d at 452, 546 N.E.2d at 591. Nonetheless, in negligent misrepresentation actions, a successful plaintiff must plead and

prove that the defendant owes a duty to the plaintiff to communicate accurate information. *A, C & S, Inc.*, 131 Ill. 2d at 452, 546 N.E.2d at 591; see also *Lyons v. Christ Episcopal Church*, 71 Ill. App. 3d 257, 389 N.E.2d 623 (1979) (holding that a seller's real estate broker has no duty to a prospective buyer to independently substantiate the seller's representations unless the real estate broker is aware of facts indicating that a seller's representation is false). We believe that the Buyer here cannot prove negligent misrepresentation on the part of defendants, under the facts of the instant case, involving a sophisticated real estate purchaser and a real estate contract containing, among other things, an "AS IS" provision, because the Buyer has failed to show that defendants had a duty to the Buyer.

As to intentional misrepresentation, the Buyer contends that defendants intentionally concealed the 1998 Crest report because it contained an opinion that the shifting lintels were "imminently hazardous." The Buyer asserts that the statement that the shifting lintels were imminently hazardous would have caught the attention of any buyer regardless of its engineering expertise. But, as we have already noted, the Buyer was aware of the shifting lintels. It is undisputed that the Sellers provided the Stamatiou quote regarding repair of the shifting lintels.

In any event, in both negligent and fraudulent misrepresentation cases, the reliance by the plaintiff must be justified, *i. e.*, he must have had a right to rely. *Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286, 402 N.E.2d 599, 601 (1980); see also *Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*, 295 Ill. App. 3d 567, 575, 692 N.E.2d 812, 818 (1998) ("no recovery for fraudulent misrepresentation, fraudulent concealment or negligent misrepresentation is possible unless plaintiffs can prove justifiable reliance, *i.e.*, that any reliance

was reasonable). The trial court concluded that any reliance on the part of the Buyer under the facts of the instant case was not justified. We agree.

Although the question of whether a plaintiff's reliance was reasonable is usually a question of fact, where it is apparent from the undisputed facts that only one conclusion can be drawn, the question becomes one for the court. *Doe v. Dilling*, 371 Ill. App. 3d 151, 174, 861 N.E.2d 1052, 1070 (2006); see also *Neptuno*, 295 Ill. App. 3d at 575, 692 N.E.2d 812, 819. In order to determine whether there was justifiable reliance on the part of a plaintiff, "it is necessary to consider all of the facts within a plaintiff's actual knowledge as well as those that he could have discovered by the exercise of ordinary prudence." *Neptuno*, 295 Ill. App. 3d at 575, 692 N.E.2d at 818. " '[A] person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another.' [Citation.]. " *D.S.A Finance Corp. v. County of Cook*, 345 Ill. App. 3d 554, 561, 801 N.E.2d 1075, 1081 (2003). "If ample opportunity existed to discover the truth, then reliance is not justified." *Neptuno*, 295 Ill. App. 3d at 575, 692 N.E.2d at 818; accord *Doe v. Dilling*, 371 Ill. App. 3d at 174, 861 N.E.2d at 1070. If a plaintiff's reliance is unreasonable in light of the information available, the loss is considered the plaintiff's own responsibility. *D.S.A Finance Corp.*, 345 Ill. App. 3d at 561, 801 N.E.2d at 1081.

As the Illinois Supreme Court long ago explained:

"The rule is well established that a party is not justified in relying on representations made when he has ample opportunity to ascertain the truth of the representations before he acts. When he is afforded the opportunity of knowing the truth of the representations he is chargeable with knowledge; and if he does not

19

avail himself of the means of knowledge open to him he cannot be heard to say he was deceived by misrepresentations." *Schmidt v. Landfield*, 20 Ill. 2d 89, 94, 169 N.E.2d 229, 232 (1960).

In the instant case, the material facts are admitted by the Buyer. The Buyer agreed to take the property "AS IS." Indeed, the Buyer specifically took upon itself the obligation of assessing the structural integrity of the property." Moreover, Mr. Kopley even admitted that under the pretense of needing more time to conduct inspections, the Buyer obtained additional time while never intending to conduct inspections. Thus, the Buyer had ample opportunity to discover whether the building was in good condition or whether it had major structural flaws.[4]

The Buyer also cites to a statement by defendants that the prior offer on the property did not go through because of minor tuckpointing issues. Again, there is no evidence that this statement was erroneous. As to Chioros' statement to the Buyer's attorney that the Buyer would not have any problems with the building, this statement is not a statement of fact but, rather, an opinion. Chioros additionally made a general comment that "you realize that it is an older building, and there's always things to take care of."

---

[4]It is not absolutely clear whether the Buyer ever did conduct an actual inspection before closing on the property. As noted earlier, in order to obtain financing, at some point prior to closing, the Buyer did prepare a "General Property Inspection" report. In any event, because the Buyer did an inspection or represented that it did one, the Buyer knew or should have known, by February 12, 1999, the condition of the building as well as the matters appearing in the public records.

In sum, the trial court correctly concluded that the Buyer cannot prove reasonable reliance. Thus, the trial court properly granted summary judgment in favor of defendants on counts II and III of the Buyer's complaint.

Count IV: Statutory Violation of Real Estate License Act of 1983

The Buyer alleged in count IV of its complaint that the Brokers violated the Real Estate License Act of 1983 (225 ILCS 455/1 *et seq.* (West 1996)).[5] The trial court granted summary judgment in favor of the Brokers based on the statute of limitations.

What is before this court on review is the circuit court's judgment, not the reasoning the court employed. *Canada Life Assurance Co. v. Salwan*, 353 Ill. App. 3d 74, 79, 817 N.E.2d 1021, 1026 (2004). "As a reviewing court, we can sustain the decision of the circuit court on any grounds that are called for by the record regardless of whether the circuit court relied on the grounds and regardless of whether the circuit court's reasoning was sound." *Canada Life Assurance Co.*, 353 Ill. App. 3d at 79, 817 N.E.2d at 1026.

As this court has noted, the legislature amended the Real Estate License Act of 1983, effective January 1, 1986, to provide that " '[n]othing in this Act shall be construed to grant to any person a private right of action for damages or to enforce the provisions of this Act or the rules and regulations issued under this Act.' [Citation.] " *Stefani v. Baird & Warner, Inc.*, 157 Ill. App. 3d 167, 174, 510 N.E.2d 65, 70 (1987) (holding that potential purchasers' alleged cause of action pursuant to the Real Estate License Act was barred and properly dismissed). We do note, however, that the legislature subsequently enacted Public Act 91-245, effective December 31,

---

[5]This is the version of the statute that was in effect at the time.

1-06-1373

1999, which restored the private right of action. Pub. Act 91-245, Art, 15, §15-5, eff. December 31, 1999 (codified at 225 ILCS 454/15-5 (West 2000)).[6] We conclude that, in the present case, summary judgment was properly granted in the Brokers' favor as to count IV because the Real Estate License Act that was in effect during the relevant time period did not provide for a private right of action.

Count V: Violation of Consumer Fraud Act

Count V of the Buyer's complaint alleged violations of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq*. (West 2002)) (the Consumer Fraud Act). The trial court granted summary judgment to defendants on count V based upon its being time barred.

The statute of limitations for an action under the Consumer Fraud Act is three years and begins to run when the cause of action accrues. 815 ILCS 505/10a(e) (West 2002). A cause of action not filed within the statute of limitations is time barred. 815 ILCS 505/10a(e) (West 2002). As the trial court noted, the Buyer completed the closing on the sale transaction for the property on February 12, 1999, yet did not file its complaint until May 2003, which was after the expiration

---

[6]Section 15-5(c) of the Real Estate License Act of 2000 now provides as follows:

"(c) This Article 15 may serve as a basis for private rights of action and defenses by sellers, buyers, landlords, tenants, real estate brokers, and real estate salespersons. The private rights of action, however, do not extend to the provisions of any other Articles of this Act." 225 ILCS 454/15–5 (West 2000).

22

of the three-year time period. Thus, the complaint was time barred.

The Buyer argues, however, that its cause of action did not accrue until the concealment of the defects of the property was discovered, allegedly in January 2003, and, therefore, the limitations period was tolled by the discovery rule. The discovery rule applies to actions brought under the Consumer Fraud Act. See *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 79, 651 N.E.2d 1132, 1136 (1995). The court trial rejected the Buyer's argument and concluded that, had the Buyer exercised reasonable diligence in completing the required property inspection in 1999, it would have discovered the construction defect (assuming the defects existed at the time).

The Illinois Supreme Court has explained the discovery rule, along with the requirement of diligent inquiry, as follows:

> "The statute starts to run when a person knows *or reasonably should know* of his injury and also knows or reasonably should know that it was wrongfully caused. *At that point* the burden is upon the injured person to inquire further as to the existence of a cause of action." (Emphasis added.) *Witherell v. Weimer*, 85 Ill. 2d 146, 156, 421 N.E.2d 869, 874 (1981).

Accord *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 416, 430 N.E.2d 976, 980 (1981). The trial court in the instant case decided that the point at which the requirement of diligent inquiry occurred was a point sooner than the point where the Buyer here allegedly knew of the injury. In essence, the trial court decided that had the Buyer exercised reasonable diligence, in the first instance, in 1999, by complying with Chicago facade ordinance that required property

23

inspections, the Buyer *would* have known of its injury in 1999.[7]  Thus, the trial court decided that the Buyer *should* have known of the injury in 1999 (assuming *arguendo* that the structural defects discovered in 2003 actually existed in 1999).

As the Buyer notes, there is no authority for the proposition that a plaintiff's failure to comply with an ordinance automatically means that the plaintiff is bound by whatever knowledge might have been learned from such compliance.  We have not located a case defining the phrase "*should* have known" as being equivalent to the situation where a person *would* have known or *could* have known had he made diligent inquiry.  While the Buyer should have complied with the law in 1999 and had the building inspected, the fact remains that the Buyer did not.  The allegation remains that the Buyer did not have knowledge of the injury until 2003.  Thus, the Buyer had not yet reached the point discussed in *Witherell* whereby it was required to "inquire further as to the existence of a cause of action."  We conclude that the trial court erred in granting summary judgment on count V on the basis that it was time barred.  We express no opinion on whether summary judgment may be appropriate on other grounds, as those issues were not decided by the trial court and were not presented in this appeal.

The Buyer also contends that the trial court erred in denying its motion for reconsideration.  We disagree.  The Buyer does not dispute that it raised new matters in its

---

[7]Again, this presumes that the defect was present in 1999, an allegation the Buyer must still prove in order to succeed on the merits.  Indeed, although it is the 1998 Crest report that the Buyer alleges proves defendants' knowledge of said defects, this report does not mention the major structural defects of which the Buyer now complains.

1-06-1373

motion for reconsideration. As this court recently explained: "Where new issues are raised for the first time in a motion to reconsider or supplement thereto, *and where there is a reasonable explanation for why the additional issues were not raised at the original hearing*, the trial court has the discretion to address them." (Emphasis added.) *O'Casek v. Childrens Home & Aid Society of Illinois*, No. 4–06–0344, slip op. at 12 (June 25, 2007), [8] citing *Delgatto v. Brandon Associates, Ltd.*, 131 Ill. 2d 183, 195, 545 N.E.2d 689, 695 (1989). The Buyer asserts that "in order to confront what [it] believed were new issues, [the Buyer] attached affidavits.

Defendants responded to the Buyer's motion for reconsideration and convinced the trial court that the Buyer's motion did not meet the standard for reconsideration. Defendants noted that the Buyer was not attempting to bring to the trial court's attention newly discovered evidence that was unavailable at the time of the original hearing or changes in existing law or purported errors in the application of the law by the court. The Buyer has failed to convince this court that the trial court abused its discretion in deciding not to consider the additional evidence, which was not "newly discovered" evidence. The Buyer has failed to show that the trial court erroneously denied the motion to reconsider.

In accordance with the foregoing, we affirm the judgment of the circuit court of Cook County granting summary judgment in favor of defendants on counts I, II, III, and IV of plaintiff's complaint. We reverse the judgment of the circuit court of Cook County granting summary judgment in favor of defendants as to count V. We remand this matter to the trial court for further proceedings consistent with this opinion.

---

[8]We granted the Buyer's motion for leave to cite *O'Casek* as additional authority.

25

Affirmed in part and reversed in part; cause remanded.

O'BRIEN and O'MARA FROSSARD, JJ., concur.