2021 IL App (1st) 192350
No. 1-19-2350
Opinion filed May 10, 2021

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the Circuit Court |
| SOLWEST, LLC, | ) | of Cook County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | No. 17 L 11792 |
| v. | ) | |
| | ) | |
| FIFTH THIRD BANK, | ) | The Honorable |
| | ) | Margaret Ann Brennan, |
| Defendant-Appellee. | ) | Judge, presiding. |
| | ) | |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Pierce and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1        Fifth Third Bank sold its historic bank building in Cicero "as is" to Solwest, LLC, a law

firm owned by Manuel Solis. Five years before the sale, Fifth Third obtained two proposals to

replace the building's aging heating, ventilation, and air conditioning (HVAC) system. Fifth Third

opted not to replace the entire HVAC system, which contractors estimated to cost as much as

$660,000. Instead, Fifth Third continued to make repairs as needed.

¶ 2        More than four years after the sale, the building's air conditioning system failed. Solis

contacted an HVAC contractor who had worked on the system when Fifth Third owned the

building. The contractor sent Solis the $660,000 replacement proposal he had prepared for Fifth

Third. Solwest's second amended complaint alleges Fifth Third (i) violated the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act or Act) (815 ILCS 505/2 (West 2018)) by failing at the time of sale to disclose known defects with the HVAC system, and (ii) breached the real estate contract by failing to disclose the replacement proposals. The trial court entered summary judgment in favor of Fifth Third on both claims.

¶ 3        We affirm. The trial court properly held that Solwest failed to present a material question of fact demonstrating Fifth Third engaged in a deceptive practice or act. Likewise, Solwest failed to present a material question of fact showing Fifth Third had an obligation to disclose the replacement proposals it obtained years earlier.

¶ 4                                        Background

¶ 5        Fifth Third Bank owned and operated a bank branch in a historic 18,816-square-foot building in Cicero. Fifth Third initially maintained the building before hiring Viox Services, Inc. to provide day-to-day facility management services. For larger systems, like the HVAC units in the building, Viox hired outside contractors to conduct in-depth and preventative maintenance.

¶ 6        The building's HVAC system needed regular maintenance. In 2008, as part of its long-term planning for the facility, Viox hired two companies, West Town Refrigeration and Therm Flo, Inc. to inspect the HVAC system and propose upgrades or replacements. West Town, which had serviced the building's HVAC system, proposed a complete overhaul, totaling $660,000.

¶ 7        Based on depositions attached to First Third's motion for summary judgment, Thomas Fiedler, West Town's vice president, intended the proposal as a budgetary tool for Fifth Third and neither suggested the system was beyond repair nor in need of replacement. Fiedler maintained that his company could continue to service the system without replacement, "There's truly nothing that's part of [the building's HVAC] system that can't be repaired."

¶ 8          Therm Flo also inspected the system and proposed upgrades and replacements. Therm Flo proposed two courses of action. Like West Town, Therm Flo believed the existing HVAC system was antiquated yet repairable and functional with proper upkeep. Kevin O'Brien, one of two Therm Flo employees responsible for preparing the company's proposal, stated in his deposition that the proposals presented an array of options in place of continued repairs and maintenance.

¶ 9          Fifth Third viewed the companies' quotes as proposals, not recommendations to replace the entire HVAC system. In his deposition, Jay Henry, Fifth Third's facility manager and liaison with Viox, stated that both quotes were "management options" for Fifth Third to keep the HVAC system functional. Henry said Fifth Third and Viox used a preventative maintenance program to conduct in-depth reviews on larger systems in the building. Brian Simmons, Viox's project manager for the facility, stated that Viox viewed the proposals as "shopping lists" for Fifth Third management to pursue should the system need upgrades. After considering the proposals, Fifth Third tabled them and had West Town replace the boiler and perform necessary maintenance to keep the existing system running.

¶ 10          In 2010, Fifth Third sold the building and relocated to a new, smaller building next door. According to Randall Morrissey of Fifth Third, HVAC issues had nothing to do with Fifth Third's move. Fifth Third had acquired the building in the purchase of a smaller bank chain. After that, regulatory and consumer demand changes meant branches could do with less space, and this building was one of several vacated.

¶ 11                                        Sale to Solwest

¶ 12          In October 2012, Solis toured the building as a potential new office for his law firm, and the following month, Fifth Third entered into a $1.1 million sale contract. The parties signed a standard real estate contract and a supplemental rider. The parties crossed out many standard

provisions, including all seller's representations. The parties also agreed that the sale would be "as is, where is and with all faults and limitations." Solwest released Fifth Third from claims, losses, or damages arising from the building's physical condition. The supplemental rider required Fifth Third to deliver to Solwest within five days after the contract's effective date, and to the extent in Fifth Third's possession, copies of any "soil studies and reports, geological and engineering studies or reports," and "all engineering consultants' reports covering all or a portion of the Premises." Solwest had 45 days for due diligence during which time it retained the right to terminate the sale for any reason.

¶ 13          Before the sale could be completed, the town of Cicero required the building to undergo inspection. The Cicero building inspector found a leaking HVAC pump and additional unrelated violations. Cicero required a licensed HVAC contractor to fix the pump issue and certify the rest of the system's functionality before issuing a certificate of compliance. Fifth Third placed $105,000 into escrow to pay for necessary repairs. On behalf of Fifth Third, Viox hired West Town to inspect the HVAC system and provide the heating certification. West Town technicians quoted the pump repair and an additional $30,000 in repairs, and certified that the system would run properly after the suggested maintenance. Solwest provided Cicero a different company's quote for the recommended repairs, and Cicero accepted the quote as complying with West Town's recommendation.

¶ 14          West Town never inspected the air conditioning system before the parties closed because Fifth Third shut the system down after moving into its new building. West Town nonetheless certified that Fifth Third properly maintained the air conditioning system during its ownership and noted the system's functionality before being shut down. West Town planned a more complete air conditioning inspection after Solwest restarted the system for the season. No evidence indicates

Solwest inspected the building or the HVAC system during the due diligence period or before the March 2013 closing.

¶ 15                                        Solwest's Ownership of the Building

¶ 16        Several months after the closing, a West Town technician restarted the air conditioning system and observed a "smooth" start-up with "no major faults." Cicero issued a certificate of compliance in July 2013. According to Fiedler, West Town technicians continued to service the building's HVAC system between four and eight times per year, and West Town never believed the HVAC system needed to be entirely replaced.

¶ 17        In June 2017, over four years after the sale, the air conditioning unit failed when West Town technicians attempted to restart it. A West Town technician described the particular year's start-up as bringing "nothing but catastrophic failure," and repairs would be a "Band-Aid on a bullet hole." The technician described the building as "mechanically defeated" and that it "is simply time for an infrastructure upgrade to the heating and cooling system."

¶ 18        Solis contacted West Town to obtain quotes and opinions on system upgrades. Fiedler sent Solis the 2008 proposal prepared for Fifth Third. Fiedler again intended the proposal as an option. West Town continued to make repairs on the building's HVAC system as recently as August 2018, and Fiedler maintained that the system did not need to be wholly replaced.

¶ 19        In November 2017, after receiving West Town's 2008 replacement proposal, Solwest filed a complaint against Fifth Third (which it amended twice) alleging Fifth Third violated the Consumer Fraud Act by failing to disclose known defects with the HVAC system at the time of sale (count I) and breached the real estate contract by failing to furnish the West Town and Therm Flo quotes as required by the parties' real estate contract (count II). As to count II, Solwest specifically contended that the West Town and Therm Flo quotes were "engineering reports" for

which the rider required disclosure. Fifth Third counterclaimed for breach of contract, alleging Solwest's lawsuit violated the as-is provision releasing Fifth Third from "all claims, losses, damages, liabilities, costs and expenses" related to the building's physical condition.

¶ 20    Both parties moved for summary judgment. The trial court granted Fifth Third's motion as to Solwest's claims and Solwest's motion as to Fifth Third's counterclaim. Fifth Third did not cross-appeal on its breach of contract claim. As a preliminary matter, the trial court held that the Consumer Fraud Act applies to the parties' transaction, rejecting Fifth Third's argument that the Act excluded transactions involving Illinois commercial real estate. The trial court also noted a lack of evidence showing Fifth Third knew of issues in 2013 warranting disclosure under the as-is provision. For the breach of contract claim, the trial court determined that the 2008 HVAC contractors' quotes constituted "proposals," and not engineering reports, so Fifth Third complied with the contract.

¶ 21                                    Analysis

¶ 22                              Standard of Review

¶ 23    Summary judgment applies where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). The court construes the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally for the opponent. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). "A triable issue precluding summary judgment exists where the material facts are disputed, or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." *Id.* Summary judgment should be granted where the right of the movant is clear and free from doubt. *Id.* We review a grant of summary judgment *de novo*. *Id.*

¶ 24                                   Consumer Fraud Act Claim

¶ 25        We first determine whether the Consumer Fraud Act applies to the parties' real estate

transaction, a question of statutory interpretation, which we review *de novo*. *Pack v. Maslikiewicz*,

2019 IL App (1st) 182447, ¶ 114 (citing *Yang v. City of Chicago*, 195 Ill. 2d 96, 103 (2001)).

Without citing cases, the trial court issued an oral ruling holding that the appellate decisions

"extended the Act to commercial transactions." We agree, and to provide clarity, we address the

issue.

¶ 26        Solwest argues that Fifth Third's frequent real estate transactions involving its bank

properties and listing the building for sale implicate consumer protection concerns under section

2 of the Act. Solwest also argues that Illinois courts have extended the Act's plain language to

similar transactions in promoting the Consumer Fraud Act's intent to protect a wide range of

Illinois consumers.

¶ 27        Section 2 of the Act states:

            "Unfair methods of competition and unfair or deceptive acts or practices, including

            but not limited to the use or employment of any deception, fraud, false pretense,

            false promise, misrepresentation or the concealment, suppression or omission of

            any material fact, with intent that others rely upon the concealment, suppression or

            omission of such material fact, or the use or employment of any practice described

            in Section 2 *** in the conduct of any trade or commerce are hereby declared

            unlawful whether any person has in fact been misled, deceived or damaged thereby.

            815 ILCS 505/2 (West 2018).

¶ 28        Section 1 defines protected parties to include natural persons, partnerships, domestic and

foreign corporations, companies, trusts, and business entities. *Id.* § 1(c). This language applies to

both Solwest and Fifth Third as corporations and business entities. A consumer refers to "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." *Id.* § 1(e). Solwest classifies as a protected consumer because it purchased the building for its own use and not for resale in the ordinary course of its business.

¶ 29    Section 1(b) outlines protected goods and transactions. Merchandise includes "any objects, wares, goods, commodities, intangibles, *real estate situated outside the State of Illinois*, or services." (Emphasis added.) *Id.* § 1(b). As real estate situated in Illinois, the building is not merchandise under the Act.

¶ 30    Solwest, nonetheless, argues that under section 1(f), the transaction falls within protected trade and commerce. We agree. The terms "trade" and "commerce" mean "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated" and includes trade or commerce directly or indirectly affecting the people of Illinois. *Id.* § 1(f). The text of section 1(f) includes real property, no matter the location. Fifth Third engaged in trade and commerce when it listed the real property for sale and sold it to Solwest. Unlike the section 1(b) definition of merchandise, section 1(f) leaves out a geographic limit.

¶ 31    Our supreme court's interpretation of section 1(f) in *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100 (2005), supports our decision. In *Avery*, the supreme court emphasized the General Assembly's intent that the Consumer Fraud Act " 'shall be liberally construed to effect' its purposes." *Id.* at 186-87 (quoting 815 ILCS 505/11a (West 1998)). Given the Act's expansive intent, the supreme court held that "a plaintiff may pursue a private cause of action under the Consumer Fraud Act if the circumstances that relate to the disputed transaction

occur primarily and substantially in Illinois." *Id.* at 187. The supreme court stated that no single formula or test exists for determining where a transaction occurred, and "each case must be decided on its own facts." *Id.* Solwest may pursue a Consumer Fraud Act claim against Fifth Third because the purchase occurred in Illinois and constituted trade and commerce protected by the Act.

¶ 32    Our decision to extend Consumer Fraud Act protections to in-state real estate transactions is not novel. In *Beard v. Gress*, 90 Ill. App. 3d 622 (1980), we applied the Act to an Illinois homebuyer's suit against the seller's real estate broker for misrepresentations during the purchase. The *Beard* court extended the Consumer Fraud Act to an in-state real estate transaction, rejecting arguments that a purchaser of domestic realty could not allege a Consumer Fraud Act claim. *Id.* at 627-28. The court noted section 1(b)'s limitation to real estate located outside of Illinois before summarizing the General Assembly's later addition of section 1(f) in 1973, expanding protections to trade and commerce without any geographic limitation. *Id.* at 626-27. Other appellate court decisions reinforce the *Beard* court's extension to domestic real estate transactions. See *Perkins v. Collette*, 179 Ill. App. 3d 852, 856-57 (1989) (allowing Consumer Fraud Act claim by homebuyer against real estate broker); *Grimes v. Adlesperger*, 67 Ill. App. 3d 582 (1978) (holding seller liable under Consumer Fraud Act for misrepresentations during commercial restaurant property sale).

¶ 33    The Consumer Fraud Act protections extend to a transaction between an Illinois homebuyer and an Illinois commercial home seller. In *Pack*, 2019 IL App (1st) 182447, ¶¶ 4, 9, the court considered the homebuyer's Consumer Fraud Act claim against the seller, who bought, rehabbed, and sold the house for commercial gain. The seller challenged the trial court's determination on the basis that the Act did not apply to " 'casual sales of single-family homes between individuals.' " *Id.* ¶ 114. The *Pack* court rejected the seller's argument, holding a seller

who regularly purchases homes for renovation and sale has a commercial purpose subject to the Consumer Fraud Act. *Id.* ¶ 118. Fifth Third acted much like the defendant in *Pack*.

¶ 34        Fifth Third also argues that the transaction does not implicate consumer protection concerns because it involved two sophisticated commercial parties. "Person" under the Act, however, includes corporations and business entities. *Supra* ¶ 27 (citing 815 ILCS 505/1(c) (West 2018)). The text applies to commercial parties like Solwest and Fifth Third. *See Peter J. Hartmann Co. v. Capital Bank & Trust Co.*, 296 Ill. App. 3d 593, 603-05 (1998) (extending Consumer Fraud Act protections to transaction between two commercial parties). That Solis, as the owner of Solwest, happens to be a lawyer satisfies the Act's expansive intent to protect consumers. We hold that Solwest may allege a Consumer Fraud Act claim against Fifth Third.

¶ 35                              *Merits of Consumer Fraud Act Claim*

¶ 36        Solwest argues Fifth Third's 2008 proposals of continued repairs to the HVAC system and relocation to a new building created a genuine dispute of material fact. The trial court ruled Solwest lacked evidence indicating Fifth Third knew of defects or conditions with the HVAC system warranting disclosure under the Consumer Fraud Act and we agree.

¶ 37        To sustain a Consumer Fraud Act complaint, a plaintiff must show (i) a deceptive act or practice by the defendant, (ii) the defendant's intent that the plaintiff relies on the deception, (iii) the occurrence of the deception in the course of conduct involving trade or commerce, and (iv) actual damage to the plaintiff (v) proximately caused by the deception. *Avery*, 216 Ill. 2d at 180 (citing *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 149 (2002)). Fifth Third's motion for summary judgment on Solwest's Consumer Fraud Act claim only contested the first and third elements. We limit our analysis to the issues raised in the parties' motions for summary judgment. See *Fillmore v. Walker*, 2013 IL App (4th) 120533, ¶ 54 (limiting appellate review of summary

judgment to elements of statutory claim movant challenged). Our previous analysis rejected Fifth Third's argument on the third element. See *supra* ¶ 33. We focus on whether Fifth Third engaged in a deceptive practice or act. We hold that it did not.

¶ 38     Solwest argues that Fifth Third's 2008 decision to seek proposals for the HVAC system's complete replacement shows it knew about defects. Although the system required regular maintenance, Fifth Third and Viox viewed the proposals as optional repairs and replacements. According to Henry and Simmons, the proposals comprised a more extensive preventative maintenance program and offered options for Fifth Third management to budget for and pursue if needed. West Town and Therm Flo representatives also considered their proposals as budgetary tools for Fifth Third to plan for future repairs rather than an assessment that the system needed total replacement. Fifth Third and Viox kept the building's HVAC functional with repairs and maintenance; their replacement proposals for budgetary, planning, and preventative maintenance purposes do not indicate knowledge of fatal defects warranting disclosure.

¶ 39     Solwest also argues that the 2008 proposals alerted Fifth Third to a need to replace the HVAC system. No one involved in the 2008 proposals from Fifth Third, Viox, West Town, or Therm Flo believed that to be the situation.

¶ 40     Testimony from West Town and Therm Flo representatives responsible for preparing the proposals contradicts Solwest's contention. Both companies considered their proposals as options should the bank decide to pursue upgrades. Fiedler intended West Town's proposal as repair and replacement options for Fifth Third's long-term planning. He stressed that West Town could keep the system in working order without any of the proposed replacements. Likewise, the Therm Flo proposal served as a budgetary tool, not an indication that the system was beyond repair. Neither

2008 proposal alerted Fifth Third to a need for total replacement of the HVAC system and Fifth Third chose to keep the system operational with as-needed maintenance.

¶ 41        Further, Solwest argues that Fifth Third's decision to downsize and relocate to a smaller building next to the existing building shows it knew about the HVAC issues. But the depositions demonstrate the reasons involve a need for less space due to industry and consumer changes. For example, Morrissey of Fifth Third stated that Fifth Third acquired the building when it purchased a smaller chain of banks. Later regulatory and consumer demand changes made so much space unnecessary, so it shrunk its footprint by more than 14,000 square feet, relocating to a smaller, more efficient building.

¶ 42        Solwest argues that Fifth Third knew of major problems with the system so it shut down the system after its move. But the evidence shows the shutdown had nothing to do with impending HVAC issues. Beyond the energy and money Fifth Third saved by not cooling a large, empty building, West Town technicians observed a "smooth" start-up with "no major faults" after restarting the system following the sale.

¶ 43        And Fifth Third could not have known of problems arising some four years later. It consistently maintained the system through Viox and third-party contractors like West Town and replaced components as needed. West Town certified the system's functionality at the time of sale, noting that Fifth Third properly maintained the system during ownership. Fifth Third also put money into escrow to pay for HVAC repairs, adding to its belief that the system would run properly.

¶ 44        Solwest fails to present evidence that Fifth Third knew of a material defect with the HVAC system at the time of sale or that Fifth Third knew at the time of sale that the HVAC system needed complete replacement.

¶ 45    The trial court properly granted summary judgment on Solwest's Consumer Fraud Act claim.

¶ 46                                    Breach of Contract Claim

¶ 47    Solwest argues that the trial court erred in granting summary judgment on its breach of contract claim because Fifth Third failed to disclose the 2008 replacement proposals, which it contends the real estate contract required. Fifth Third argues that the proposals were not engineering reports warranting disclosure, and Solwest lacks evidence Fifth Third even possessed the proposals during the sale. Fifth Third also argues that Solwest cannot recover due to the parties' "as is" agreement. The trial court held that the documents were proposals and not engineering reports subject to disclosure. Again, we agree.

¶ 48    To establish a breach of contract, a plaintiff must prove (i) a valid and enforceable contract existed, (ii) performance by the plaintiff, (iii) breach by the defendant, and (iv) resulting damages to the plaintiff as a result defendant's breach. *Carlson v. Rehabilitation Institute of Chicago*, 2016 IL App (1st) 143853, ¶ 13.

¶ 49    We first address whether Fifth Third breached the contract. It did not. The supplemental rider to the parties' standard real estate contract required Fifth Third deliver to Solwest, to the extent in its possession, copies of "soil studies and reports, geological and engineering studies or reports," and "all engineering consultants' reports covering all or a portion of the Premises." The evidence show the documents were intended as a tool for Fifth Third's long-term planning. Neither company's proposal was a technical analysis of the existing system but instead a list of options. Moreover, the 2008 proposals did not reflect the system's condition in 2013, nearly five years later. And that West Town and Therm Flo employed or consulted with engineers did not, without more evidence, transform the proposals into engineering reports.

¶ 50  The "as-is, where-is, and with-all-faults" clause also defeats Solwest's breach of contract argument. The parties eliminated all seller's representations about the condition of the building and agreed in the supplemental rider that the sale was "as is, where is, and with all faults." In *Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd.*, 376 Ill. App. 3d 1006, 1016-17 (2007), we explained these provisions frequently appear in real estate contracts and signify that the purchaser accepts the property "in its existing condition with whatever faults it may possess and implies that the seller is relieved of any further obligation to reimburse for loss or damage because of the property's condition." The property in *Kopley Group V.* was an older building, and the buyer had access to inspect before the closing, as did Solwest. "As-is" provisions control as long as they are both expected and part of the bargain. *Id.* at 1017. Thus, Solwest's breach of contract claim fails as a matter of law.

¶ 51  Because Fifth Third did not breach the parties' contract, we need not address whether Fifth Third possessed the documents at the time of sale.

¶ 52  Affirmed.

---

**No. 1-19-2350**

---

| | |
|---|---|
| **Cite as:** | *Solwest, LLC v. Fifth Third Bank*, 2021 IL App (1st) 192350 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-L-11792; the Hon. Margaret Ann Brennan, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Andrew J. Fink, of Solis Law Firm, P.C., of Cicero, Jason A. Richardson and Bradley J. Aiken (*pro hac vice*), of McDowell Hetherington LLP, of Houston, Texas, and James M. Chambers (*pro hac vice*), of McDowell Hetherington LLP, of Arlington, Texas, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Lenny D. Asaro, of Dinsmore & Shohl LLP, of Chicago, and Robert M. Zimmerman and Andrew B. Cassady, of Dinsmore & Shohl LLP, of Cincinnati, Ohio, for appellee. |

---