**Wayne WILSON, Plaintiff,**

v.

**FIRST AMERICAN TITLE COMPANY, a California Corporation, Defendant.**

**Case No. 09–1165.**

United States District Court, C.D. Illinois.

May 4, 2011.

Jonathan A. Backman, Law Office of Jonathan A. Backman, Bloomington, IL, for Plaintiff, Wayne Wilson.

David G. Lubben, Davis & Campbell, LLC, Peoria, IL, for Defendant, First American Title Company.

## ORDER

MICHAEL M. MIHM, District Judge.

Now before the Court is Defendant First American Title Company's ("First American") Motion for Summary Judgment. For the reasons set forth below, the Motion [# 16] is GRANTED.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1332(a)(1), as the parties are of diverse citizenship, and the amount in controversy exceeds $75,000.

## BACKGROUND

Plaintiff Wayne Wilson ("Wilson") has been a practicing attorney in Wyoming since 1988. He is currently a sole practitioner in Hulett, Wyoming, and his practice includes litigation and transactional real estate work. He is also the owner of a cattle ranch in Wyoming, and has served as an attorney for parties in the sale and purchase of cattle. Wilson and Mark Ray ("Ray") met each other in 2001 when Ray bought cattle from Wilson's neighbors in Wyoming. Wilson then went to Ray's property in 2002 for a club calf sale, and thereafter the two men would enter into oral contractual agreements for the sale of

cattle. Those agreements involved Wilson wiring money to Ray or Ray's businesses, Berwick Black Cattle and Source Champions, as a loan or investment. Ray would then have funds to purchase cattle, would try to re-sell the cattle, and Wilson would receive a share of the profits as determined by Ray. The two men engaged in these transactions through phone calls by Ray to Wilson informing the latter that Ray had found cattle somewhere but did not have enough money to buy all of them. In early 2003, Wilson "rolled" his investments in Ray's cattle transactions with other parties, meaning that the principal money he invested previously would be used in another transaction that Ray entered into. Wilson would receive "kickers," payments considered profit by both men, as the various cattle transactions took place.

In February 2004, Wilson and Ray entered into a Reinvestment Loan Contract which included a reinvestment date, reinvestment amount of $400,000.00, an investment closer date, a repay amount of $400,000.00, and no interest rate. In 2004 and 2005, Ray signed "Notes" which listed Ray as borrower and Wilson as the note holder on a variety of loans.[1] In a letter dated February 3, 2005, Wilson wrote to Ray stating that Wilson's $854,000.00 investment was to be closed out over six months before the date of the letter. In the letter, Wilson acknowledged that Ray had been in a car accident, but that Wilson had been waiting since August 2004, to be repaid his investment. Wilson gave Ray two options: 1) provide Wilson with a summary of where Wilson's money was invested, including dates for when the transactions would be complete and a summary of risk for those transactions, or 2) provide Wilson with the necessary ownership infor-

mation and legal description of unencumbered real property with a value sufficient to secure Wilson's investment, and further provide Wilson with a promissory note and mortgage. Ray did not choose the first option.

Following Ray's receipt of the February 3, 2005, letter, he and Wilson discussed Ray's properties on which Wilson could take a mortgage. The properties suggested by Wilson were rejected by Ray. Ray suggested some of his Warren County, Illinois properties, stating that Ray's parents held a mortgage on the properties but that it had been paid off. Ray further informed Wilson that a local bank held a lien on the one property where there was a cattle sale barn (hereinafter "Ray–Wilson Mortgaged Property"). Wilson did not ask Ray for documentation to show that Ray owned the relevant Illinois properties. Wilson was dissatisfied with the answers he received from Ray regarding a possible lien by a local bank on the cattle sale barn.

Ray gave Wilson the name of his Monmouth, Illinois attorney, Ron Stombaugh ("Stombaugh"). Wilson spoke with Stombaugh about Ray's parents' mortgage on the Ray–Wilson Mortgaged Property, but did not discuss the possible bank lien or mortgage on Ray's Warren County properties. Wilson did not ask Stombaugh for copies of the other mortgages on Ray's properties. Stombaugh was aware that Tompkins State Bank did indeed have a mortgage on the Ray–Wilson mortgaged property in Warren County, and Stombaugh had a copy of the title insurance policy for Tompkins State Bank at the time when Wilson and Ray were sorting out a potential mortgage for Wilson's benefit. Wilson did not request title information on any of the relevant property from

---

1. The Notes were for the amounts of $250,000.00 in March 2004, $354,000.00 in April 2004, $354,000.00 in June 2004, $250,000.00 in February 2005, $304,000.00 in February 2005, and another $250,000.00 in February 2005.

Stombaugh, and did not ask him whether a bank held a mortgage on it.[2] Stombaugh was the one to prepare the promissory note and mortgage on the Ray–Wilson Mortgaged Property in the amount of $804,000.00. Ray informed Wilson that the property was worth about $1 million. Wilson did not review the mortgage document before Ray and his wife signed it, and he did not have the assistance of his own attorney during the preparation of documents by Stombaugh. Ray and his wife signed the mortgage on June 20, 2005.

Wilson came to Warren County, Illinois on September 3, 2005, for a cattle sale held at Ray's sale barn. When Wilson questioned Ray about whether his parents' mortgage had been released, Ray did not answer. Though he was in town, Wilson did not review records at the County Recorder's Office. On September 13, 2005, Wilson called Defendant First American's[3] Galesburg, Illinois office, spoke with Lisa Reynolds, requested an ownership and encumbrance report[4], and was quoted $80.00 as the standard charge for a certified written judgment and lien search report. During this initial call with Reynolds at First American, Wilson did not discuss his business relationship with Ray nor their cattle transactions.

On September 14, 2005, Barbara Woolhiser ("Woolhiser") at First American emailed Wilson. In her email, she informed Wilson that Ann from First American went to Warren County the previous day and brought back copies of various documents related to the Ray–Wilson Mortgaged Property. Woolhiser proceeded to list a warranty deed from Ray's parents to Ray, a mortgage granted by Ray to his parents, and a mortgage granted by Ray and his wife to Wilson. There was no reference made to any mortgage granted to Tompkins State Bank in the email. Woolhiser asked, "Is this what you are looking for? We can do a written report for you. Thanks and let me know." Dft's Exh. 15. Later on September 14, 2005, Wilson emailed a reply to Woolhiser stating, "If there is only one mortgage for $166,890 ahead of me that is great news! I expected a bank mortgage. Do all the legal descriptions match up? I don't need a written report. Can you fax or email copies of the documents Ann brought back please?" Dft's Exh. 18.

The Ann referred to in Wilson's email was Ann Peck, the person who went to the Warren County Recorder of Deeds office to search the relevant properties. Her procedure included locating the most recent deed on a property, and locating a copy of all the mortgages on each tract of land. If the tract index showed a release of a mortgage, Peck would have to determine whether the mortgage covered just one tract, and if not, she would have to review the release to determine whether it was a partial or complete release. Peck was both a title examiner and searcher, and she would be the one at the Galesburg First American office to prepare certified written judgment and lien search reports. Woolhiser, on the other hand, was not a title examiner and did not prepare certified written reports. On September 15, 2005, Woolhiser faxed Wilson copies of the documents she listed in her September 14th email, and an invoice of $50.00 for copies and time. First American did not

2. Stombaugh provided Wilson, after the Ray–Wilson mortgage was executed, with an appraisal of a portion of the relevant property showing that a building and surrounding 10 acres had a fair market value of $850,000.00.

3. Defendant First American Title Company provides title abstracts and title insurance to customers around the country.

4. These reports are also referred to by the parties as "judgment and lien search reports."

send Wilson a formal lien search form with the results.

Wilson and Ray further discussed, in later September and October 2005 and again through June or July of 2006, that Tompkins State Bank thought it had an existing mortgage on Ray's property. In November 2005, a Consent Order was entered against Ray, his Berwick Black Cattle Company, and Source of Champions as Respondents. The Consent Order provided that Ray was in the business of cattle purchases and sales, that he sold financial instruments including investment loan contracts and promissory notes to investors to cover the costs of purchasing, sorting and re-selling cattle because of a purported shortage of funds under an operating loan from his bank, and that investors were to receive returns of their principal in the form of "performance" checks. The Consent Order went on to state that the investment contracts and promissory notes were securities as the term was defined in the Illinois Securities Law of 1953, that non-exempt securities shall be registered with the Illinois Secretary of State prior to their offer or sale, and that Ray and his businesses had failed to register such securities with the Secretary of State. As a result of the violation, Ray was fined $20,000.00 and was permanently prohibited from offering and selling securities in Illinois. Though Wilson reviewed the Consent Order in December 2005, he did not request financial statements from Ray, did not request any other information regarding Ray's financial sources, and did not retain legal counsel for advice in his further business dealings with Ray.

Back in September 2005, when Wilson visited Ray's sale barn for a cattle sale, Wilson purchased cattle but did not pay new money for them. Instead, he was credited against the amounts Ray owed him. Wilson had determined that as of December 2005, Ray still owed $689,950.00

on the June 20, 2005, promissory note and mortgage to Wilson. In January 2006, Ray sought Wilson out for money to purchase cattle at an Exposure sale in Oklahoma. Wilson explained to Ray that the they could not do things as before, given the Illinois Consent Order, and Wilson was otherwise hesitant to provide Ray with more money given the amount unpaid on his mortgage. Thereafter, Wilson set up a limited liability company, WW Cattle Company LLC, so that he could purchase cattle rather than lend money to Ray to do so. That had the effect of leaving the cattle in Wilson's name, he would own title to them, and Ray would act as Wilson's agent.

On January 9, 2006, Wilson wired the manager of a cattle sale in Oklahoma $237,300.00 to purchase cattle at the previously mentioned Exposure sale, and on April 10, 2006, Wilson wired Ray $227,000.00 to purchase breeding stock cattle in Oklahoma. He did not receive a bill of sale for his purchased cattle, nor other documentary proof of ownership. As the owner of the cattle, Wilson bore the risk of their loss. He did not have any written agreement with Ray that Ray had to first obtain his approval to re-sell the cattle, and the two had no agreement that Ray had to get Wilson's written approval before the cattle were moved to different locations. Wilson did not have written agreements with anyone regarding the cattle. Wilson did not purchase insurance for the cattle. Instead, Wilson and Ray had an oral understanding that Ray would be in charge of the cattle. On January 18, 2006, Wilson emailed Ray's employee asking if she had checks from Ray to Wilson for the Exposure cattle sale proceeds. Wilson did not know how many of the Exposure cattle Ray was able to sell. On March 1, 2006, Wilson again emailed Ray's employee, informing her that he received two blank checks from Ray and that Wil-

son would fill out one for $32,500.00 as "partial payment on principal out on the Exposure cattle." Wilson received no proceeds from the resale of the breeding stock cattle. On April 27, 2006, Wilson wired Ray $140,000.00 to purchase feeder cattle. Again, Wilson did not receive proceeds from Ray's sales, if any, of the cattle.

In the early part of August 2006, Wilson retained Illinois attorney Barry Barash to initiate a foreclosure action against the Ray–Wilson Mortgaged Property. Wilson received a Judgment and Lien Search from Barash dated August 28, 2006, in which the Tompkins State Bank mortgage of $935,000.00 was listed, as were the mortgages to Ray's parents and Wilson. Subsequently, in December 2006, Ray was placed into involuntary bankruptcy. Ultimately, given the priority of the Tompkins State Bank mortgage over that of Wilson's, Tompkins received more upon the bankruptcy sale of the Ray–Wilson Mortgaged Property than did Wilson. On May 12, 2009, Wilson filed his Complaint against First American alleging negligent misrepresentation by First American for its claimed failure to locate and inform Wilson of the existence of the Tompkins State Bank mortgage. First American has now moved for summary judgment, the matter is fully briefed, and oral argument was held on April 26, 2011. This Order follows.

## DISCUSSION

Summary judgment should be granted where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cain v. Lane*, 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the nonmoving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the nonmoving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. This Court must then determine whether there is a need for trial—whether, in other words, there are any genuine factual issues that can properly be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 931 (7th Cir.1995). Finally, where a party bears the burden of proof on an issue, he or she must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact requiring trial. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir.1993).

■ To state a claim for negligent misrepresentation under Illinois law, a plaintiff must establish: 1) a false statement of material fact, 2) carelessness or negligence in ascertaining the truth of the statement by the party making it, 3) an intention to induce the other party to act, 4) action by the other party in reliance on the truth of

the statement, 5) damage to the other party resulting from such reliance, and 6) a duty on the party making the statement to communicate accurate information. *First Midwest Bank, N.A. v. Stewart Title Guaranty Company*, 218 Ill.2d 326, 300 Ill.Dec. 69, 843 N.E.2d 327, 332 (2006). To survive a motion for summary judgment, the nonmoving party must present evidence to establish a genuine issue of fact as to all the essential elements of a negligent misrepresentation cause of action. *See Sohaey v. Van Cura*, 240 Ill.App.3d 266, 180 Ill.Dec. 359, 607 N.E.2d 253, 265 (1993) (affirming trial court's grant of summary judgment on negligent misrepresentation claim where plaintiffs failed to establish essential element of their reliance upon the defendants' alleged negligent misrepresentations).

### 1. False Statement of Material Fact

■ A false statement of material fact encompasses three things: 1) it was a misrepresentation, 2) it involved a fact, and 3) the misrepresentation was material. *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill.App.3d 642, 260 Ill.Dec. 735, 762 N.E.2d 1, 7 (2001) (defining the false statement of material fact element in an action for common law fraud); *see also Kopley Group V., L.P. v. Sheridan Edgewater Prop., Ltd.*, 376 Ill.App.3d 1006, 315 Ill.Dec. 218, 876 N.E.2d 218, 228 (2007) (stating that the elements of negligent misrepresentation and fraudulent misrepresentation to be plead and proved by a plaintiff are "quite similar"). First American argues that the September 14, 2005, email from Woolhiser to Wilson, which did not list the Tompkins State Bank mortgage, contained no false statement of fact. First American contends that because Wilson did not order a written judgment and lien search report, First American did not perform a title examination and so the email alone did not provide any certification of all existing mortgages on the property. In other

words, the email was not a guarantee by First American of all liens and encumbrances that affected title to the property subject to the Ray–Wilson mortgage, and thus it did not contain false statements of fact.

Wilson counters that the September 14, 2005, email was a misrepresentation given that there is no dispute that Wilson ordered a judgment and lien search, that Ann Peck at First American performed a search, and that Woolhiser reported as to only a warranty deed, a mortgage granted by Ray to his parents, and the Ray–Wilson mortgage in the email. Wilson further points to his deposition and Declaration testimony in which he testified to a telephone conversation with Woolhiser later in the day on September 14, 2005. During that phone call, he allegedly confirmed that a written report would not provide him with any more information than Woolhiser's email and the documents she would be sending would provide him. First American responds that Wilson's testimony as to what Woolhiser told him about a written certified report is equivocal and self-serving, and thus insufficient to establish factual disputes at the summary judgment stage.

Contrary to what First American argues, it is not necessarily determinative that Woolhiser's email did or did not certify that the only existing mortgages were those she listed in that email. Considering the email alone, it is evidence sufficient to create a genuine issue of material fact as to whether First American made a misrepresentation involving the fact of what encumbrances affected title to the property upon which Wilson requested a judgment and lien search report. Furthermore, such a misrepresentation would be material where the evidence in the record clearly provides that Wilson requested First American's services for the very purpose of identifying the ownership and encum-

brances of the property that was part of the Ray–Wilson mortgage.

### 2. Carelessness or Negligence in Ascertaining the Truth of the Statement by the Party Making It and a Duty on the Party Making the Statement to Communicate Accurate Information

First American does not directly address the second element of Wilson's claim for negligent misrepresentation—carelessness or negligence in ascertaining the truth of the statement by the party making it. Instead, it argues that it bore no duty to Wilson to begin with, where he did not order a written certified judgment and lien search report. Wilson, on the other hand, says that there clearly existed a duty on the part of First American to provide him with accurate title information. He argues that First American's failure to locate and advise him of the Tompkins State Bank mortgage constituted a breach of its duty as a matter of law. Wilson states that there was a breach by First American regardless of whether the failure to advise him stemmed from Peck's failure in obtaining copies of the Tompkins mortgage and release, or from Woolhiser's incorrect determination that she did not need to advise him of the Tompkins mortgage.

The existence of whether a duty exists is a question of law for the court to decide. *Kelley v. Carbone,* 361 Ill.App.3d 477, 297 Ill.Dec. 355, 837 N.E.2d 438, 441 (2005); *General Elec. Capital, Corp. v. Equifax Serv., Inc.,* 797 F.Supp. 1432, 1438 (N.D.Ill.1992). First American cites to *First Midwest Bank* in support of its argument that it owed Wilson no duty to disclose all existing mortgages and encumbrances on the property. In *First Midwest Bank,* the Illinois appellate court resolved the issue of whether First Midwest Bank had sufficiently alleged that the defendant title insurance company had a

duty to convey accurate information, resulting from the fact that when the company issued its title commitment, it was in the business of supplying information for the guidance of others in their business transactions. 300 Ill.Dec. 69, 843 N.E.2d at 333. The appellate court considered an amicus brief submitted by American Land Title Association ("ALTA") in which ALTA explained an abstract of title's sole purpose is to provide information regarding title, while a title commitment is just a promise to insure a particular state of title. *Id.,* 300 Ill.Dec. 69, 843 N.E.2d at 335. The appellate court thereafter determined that given the nature of a title commitment, the defendant title insurer was not in the business of supplying information and so First Midwest Bank could not state a cause of action for negligent misrepresentation. *Id.,* 300 Ill.Dec. 69, 843 N.E.2d at 336. First American argues that just as the plaintiff in *First Midwest Bank* tried to treat a title commitment like an abstract of title, here, Wilson is trying to treat Woolhiser's email like an abstract of title.

Here, the facts in the record provide that Wilson called First American's Galesburg, Illinois office requesting an ownership and encumbrance report, that First American quoted him $80 as the standard charge for a certified written judgment and lien search report, that the order form listed "judgment and lien search" and included the note "wants it emailed," that Peck went to Warren County and brought back copies of several documents regarding the relevant property, and that Woolhiser emailed Wilson a list that included a warranty deed and two mortgages on the property. First American's attempt to draw a distinction between a certified written judgment and lien search report and Woolhiser's email in the same way in which a distinction was drawn between a title commitment and abstract of tile in *First Midwest Bank* is unpersuasive.

In *First Midwest Bank,* a title commitment was of a different nature than an abstract of title. While here, Woolhiser's email was at least of the same nature as a formal written judgment and lien search report. The conclusion in *First Midwest Bank* that the title insurer was not in the business of supplying information cannot be the conclusion reached in the instant case. *See* 300 Ill.Dec. 69, 843 N.E.2d at 336. Furthermore, Woolhiser's email did not qualify the results as only partial or that the email was simply First American's attempt to determine if it had located the correct property. First American has also failed to establish by record evidence that a duty to disclose all existing mortgages and encumbrances on the property was contingent upon the issuance of a written certified judgment and lien search report. What the record does show is that Wilson sought out First American's services for a judgment and lien search, First American proceeded to search the records, and ultimately provided Wilson with an email containing what appeared to be a report of the search results. Ultimately, the Court finds that First American had a duty to communicate accurate information to Wilson at the time it emailed him on September 14, 2005. Given the fact that First American owed a duty to communicate accurate information to Wilson and the evidence in the record that the September 14, 2005, email did not list the Tompkins State Bank mortgage, there is a triable issue as to whether First American was careless or negligent in ascertaining the truth of the statements it made in that email.

### 3. An Intention to Induce the Other Party to Act

First American contends that Wilson has presented no evidence whatsoever of any alleged intent by it to induce Wilson to take any action as a result of the information it provided him on the Ray–Wilson Mortgaged Property. Wilson asserts throughout his pleadings that as a result of the information provided to him by First American, he believed his outstanding claim against Ray was almost fully secured by his mortgage on the relevant property, and that his belief led to his later decisions to loan additional amounts of money to Ray for various cattle purchases. First American cites to *F:A J Kikson v. Underwriters Lab., Inc.* where the Seventh Circuit explained that the plaintiff would have to establish that the defendant "made statements intending to induce him to act in a particular way that damaged his business prospects" in order to show negligent misrepresentation. 492 F.3d 794, 801 (7th Cir.2007). During oral argument, First American continued to assert that Wilson must prove the third element of a negligent misrepresentation claim under the circumstances of this case.

Wilson argues that the third element of his claim constitutes a form of causation argument to the extent that a plaintiff could prevail on a negligent misrepresentation claim by showing that the defendant, whose professional advice was sought, knew that the plaintiff may rely on the defendant's information and that the plaintiff's damages were foreseeable consequences of defendant's misinformation. Wilson contends that *F:A J Kikson* is inapposite here because Wilson both relied on First American's information and was damaged as a result, unlike in *F:A J Kikson,* 492 F.3d at 801–02 (reversing jury verdict in plaintiff's favor on negligent misrepresentation claim where the defendant made misrepresentations that encouraged the plaintiff's conduct which was not more harmful than ceasing that conduct). Wilson also argues that the intent to induce element has never been an element of a negligent misrepresentation claim against a title searcher such as First American.

At oral argument, Wilson asserted that the intent to induce element was added to place a limitation on the ability of third parties to bring negligent misrepresentation claims, and thus here, he does not have to prove that element where he and First American were directly involved. He cites to *Chase v. Heaney*, an Illinois Supreme Court case from 1873, in which the court provided that the failure by a professional engaged in the business of searching public records, examining titles, and making abstracts for compensation could be liable to the party injured by the professional's failure in the performance of his duties. 70 Ill. 268, at *1 (Ill.1873). In response to Wilson's reference to *Chase*, First American explained at oral argument that that case involved simple negligence rather than negligent misrepresentation. Wilson additionally cites to the Illinois Supreme Court case of *Rozny v. Marnul* for the proposition that the "intent to induce" element has no relevance to his instant claim. 43 Ill.2d 54, 250 N.E.2d 656 (1969).

In *Rozny*, the Illinois Supreme Court considered the scope of the defendant surveyor's liability by using traditional tortious misrepresentation standards. 250 N.E.2d at 660. The *Rozny* court noted that the defendant might have reasonably foreseen that the plat he prepared would be relied upon by third parties in connection with the financing and purchase of the surveyed property, where the surveyor admitted that he knew plats were customarily used by lending agencies and others. *Id.* at 662. Wilson makes the argument that the surveyor defendant in that case could not have intended to induce the plaintiff to purchase the property at issue because the defendant did not even know of the plaintiff's existence at the time the surveyor prepared the plat. While that

may be Wilson's own reading of the *Rozny* case, it does not negate the fact that intention to induce the other party to act is a required element of a claim for negligent misrepresentation. Furthermore, the *Rozny* court was focused on the narrow issue of the scope of a defendant's liability in a case brought by a party not in privity of contract with the defendant. 250 N.E.2d at 660. Wilson also cites *Kelley v. Carbone* in support of his argument that in the context of professional negligence, the defendant's intent is satisfied by demonstrating that "the purpose and intent of the relationship was to benefit ... the plaintiff." *Kelley*, 297 Ill.Dec. 355, 837 N.E.2d at 441. As with *Rozny*, the *Kelley* court was focused on the scope of the duty owed where the plaintiff brought an action against a defendant who was employed by a third party. *Id.* Those are not the circumstances of this case.

Here, Wilson as master of his complaint, brought one claim for negligent misrepresentation, and so he must establish all of the elements of that cause of action in order to succeed. That cause of action includes the element of an intention to induce the other party to act. *See First Midwest Bank*, 300 Ill.Dec. 69, 843 N.E.2d at 332; *Kopley Group V., L.P.*, 315 Ill.Dec. 218, 876 N.E.2d at 228 (listing "intention to induce the other party to act" as an element of fraudulent misrepresentation and further explaining that negligent misrepresentation has the same elements as fraudulent misrepresentation except for the defendant's mental state). Contrary to what Wilson contended at oral argument, Illinois case law does not provide that application of the third element of a negligent misrepresentation claim is limited only to situations where third parties are involved.[5] The more recent pronouncement

---

5. Indeed, *First Midwest Bank* involved a defendant title insurance company which issued a lender's policy of title insurance directly to the plaintiff bank. 300 Ill.Dec. 69, 843 N.E.2d at 329.

of the elements of a claim of negligent misrepresentation claim in Illinois provides that intent to induce is a separate and essential element. The Court, from a policy perspective, finds it problematic that this third element imposes a heightened level of knowledge on the part of the defendant as a predicate for liability. Nevertheless, the Court is bound to follow established Illinois law, and under that law, intent to induce the other party to act is an essential element of Wilson's claim.

■ Accordingly, the Court finds that there is no genuine issue of material fact as to whether First American intended to induce Wilson to act in any way, and thus First American is entitled to judgment as a matter of law. At the time Wilson contacted First American to run a judgment and lien search on the Ray–Wilson Mortgaged Property, he did not discuss his prior cattle investments with Ray, nor that he planned to engage in further business with Ray given the results of First American's search. In his deposition testimony, Wilson was asked whether he indicated to First American, at the time he requested an ownership and encumbrance report, why he wanted the information. He replied, "I believe I told [First American] that I had a mortgage on the property, and I wanted to see if there were other encumbrances." Dft's Exh. 1 at 161. When asked whether he discussed any transactions with Lisa Reynolds at First American related to Ray, specifically regarding the men's business relationship relating to cattle, Wilson responded that he did not. *Id.* It is significant that Wilson sought First American's services nearly three months after he recorded his June 20, 2005, mortgage on the relevant property. Such facts make clear that First American did not intend to induce Wilson to act in any way, certainly not in any way regarding cattle investments, where First American was told only that Wilson already had a mortgage on the property and

wanted to see if there were other encumbrances. Because Wilson is unable to establish that there is a genuine issue of material fact as to third element of his negligent misrepresentation claim, First American's Motion for Summary Judgment is granted. As the Court has determined that Wilson is not able to establish an essential element of his claim, the remaining two elements of that claim need not be further addressed. *See Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548 (explaining that the plain language of Federal Rule of Civil Procedure 56(c) mandates summary judgment where a nonmoving party's complete failure of proof concerning an essential element of his or her case makes all other facts immaterial). Once again, the Court thinks it bad policy to require satisfaction of the third element of Wilson's negligent misrepresentation claim under these circumstances, but Illinois law controls.

### Settlement Offer

■ In Wilson's Response to First American's Motion for Summary Judgment, he states facts detailing a proposed settlement made by Ray through his attorney, Stombaugh, to Wilson on July 25, 2006. First American strenuously objects to the Court's consideration of this evidence, on the grounds that it is inadmissible as a settlement communication under Federal Rule of Evidence 408, is inadmissible hearsay, and because First American has never had the opportunity to take discovery on the issue of settlement. Indeed, Wilson made no mention of any settlement offer in his Complaint. However, discussion of that settlement offer did take place during the deposition of Ray's attorney, and Ray's email to Stombaugh detailing the settlement was made part of that deposition. Plf's Exh. E at 63–65; Plf's Exh. F. To the extent that First American argues the settlement evidence is inadmis-

sible under Rule 408, it is correct. The rule prohibits use of such evidence when offered "to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction." FED.R.EVID. 408(a). Wilson is attempting to introduce the evidence in further support of his argument that he relied to his detriment on First American's September 14, 2005, email by turning down the proposed settlement. In other words, he is doing so to prove First American's liability.

In any event, evidence of a proposed settlement offer and Wilson's assertions that he would have accepted the offer had he known of the seniority of the Tompkins State Bank mortgage does not change the outcome of First American's Motion for Summary Judgment. As First American contends, the documents[6] Wilson cites in support of those assertions are ambiguous, and the other evidence in the record fails to establish a genuine issue as to whether Wilson's ignorance of the Tompkins mortgage led to his refusal of Ray's settlement offer. The statement in Wilson's Declaration that, "Had plaintiff known that about the Tompkins Mortgage and its seniority to the Wilson Mortgage, plaintiff would have accepted the $750,000 that Mr. Ray was offering," was made with the benefit of hindsight and the knowledge that this case was ongoing. Such a self-serving conclusory statement is insufficient at the summary judgment stage, given the lack of facts in the record to support it. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir.2004) (internal citations omitted) (explaining the Seventh Circuit's previous holdings that "self-serving statements contained in an affidavit will not defeat a motion for summary judgment when those

statements are without factual support in the record").

## CONCLUSION

For the reasons set forth above, Defendant First American Title Company's Motion for Summary Judgment [# 16] is GRANTED. This matter is now TERMINATED.

---

6. The documents being the settlement offer made by Ray and faxed by Attorney Stombaugh to Wilson, and Wilson's letter responding to the offer. Plf's Exh. F and Wilson Decl. Exh. G.